Simon H. Strickler v. Commissioner. Otto Cooper v. Commissioner.
Simon H. Strickler v. Commissioner
Docket Nos. 29439 and 29440.
United States Tax Court
1951 Tax Ct. Memo LEXIS 130; 10 T.C.M. (CCH) 786; T.C.M. (RIA) 51256; August 23, 1951
*130 George Surosky, Esq., and William Surosky, Esq., 1441 Broadway, New York, N. Y., for the petitioners. Stanley W. Herzfeld, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioners assail respondent's determination of deficiencies in income tax for the calendar years 1945 and 1946 of $19,705.99 and $5,157.78, respectively, against petitioner Simon H. Strickler, and of $13,092.71 and $3,207.72, respectively, against petitioner Otto Cooper. Certain adjustments in the case of the former petitioner are not contested. The sole issue is whether respondent erred in taxing to petitioners that portion of the profits of an enterprise nominally distributable to members of their respective families. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners filed their tax returns for the periods involved with the collector of internal revenue for the fifth district of New Jersey. At all times material to this proceeding, petitioner Otto Cooper, hereinafter called Cooper, was an attorney, and petitioner Simon H. Strickler, hereinafter called Strickler, was an accountant *131 engaged in the practice of public accounting under the name of Simon H. Strickler & Co., a partnership consisting of Strickler and his brother Abraham Strickler. During all of 1943 and 1944, and until the latter part of 1945, Abraham Strickler was in the armed forces of the United States. On May 1, 1943, the partnership of Holyoke Fabric Sales Company, hereinafter called Holyoke, was organized to engage in the business of selling yarns and similar material. The partners and their respective interests were: Strickler - 30 per cent; Lawrence Diamond - 30 per cent; Robert L. Anderson - 20 per cent; Felix Brawer - 10 per cent; and Robert L. Gilman - 10 per cent. Strickler was a partner in that business throughout the years in controversy. Holyoke obtained its yarn from Holyoke Fabrics, Inc., in which Strickler owned no interest. Strickler's accounting firm did the accounting and Cooper acted as attorney for both Holyoke and Holyoke Fabrics, Inc. On and prior to June 1, 1943, James Conway was engaged in the business of manufacturing knitted shawls and similar merchandise under the name of Conway Modes. Previous to that date he had been forced into bankruptcy and his credit was poor. *132 The supply of yarn became scarcer due to military demands, and Conway had difficulty obtaining yarn for his business. In order to obtain yarn he approached Brawer, but had no success. Conway then proposed to Cooper that the latter join him in partnership. Cooper spoke to Strickler, suggesting that Strickler become a partner with Cooper in Conway's business. Strickler had not previously been in the yarn or knitting business and he had no specialized knowledge of the yarn business. Strickler took the matter up with his partners in Holyoke who stated that they had no objection, and that they would sell yarn to the proposed firm. On June 1, 1943, in order to obtain yarn for Conway Modes for processing, Conway entered into an arrangement with Cooper and Strickler. On that date, with the consent of Brawer, Conway, Cooper, and Strickler executed a "Partnership Agreement," stating that they agreed to be general partners in the business of dealing in knitted articles at wholesale and retail, under the name of Occo Knitting Company. The instrument provided, among other matters, that the partnership should continue until terminated by mutual agreement or by ninety days' written notice served *133 by any partner on the others; that from time to time by mutual assent any of the partners might make contributions to capital in cash which were to be treated as loans and to be repaid without interest; and that Conway, Cooper, and Strickler should have an interest in the net profits of 50 per cent, 25 per cent, and 25 per cent, respectively. Thereafter, Occo Knitting Company, herein after called Occo, engaged in the business of buying, processing, dyeing, and knitting yarn, and selling finished knitted products. Sales from Holyoke to Occo constituted only a small part of Holyoke's business. Occo secured all of its yarn from Holyoke. The yarn was consigned to Conway Modes for manufacture and returned to Occo for further processing, the finished product being sold by Occo. Conway managed all the activities of Occo which was operated from his place of business. Strickler did Occo's accounting work, for which payment was made. Strickler and Cooper took no active part in operations but had general discussions with Conway regarding the affairs of the company. The primary function of Strickler and Cooper was to obtain yarn for Occo from Holyoke. No capital contribution was made to Occo *134 by any of the three partners. From June 1, 1943, to January 31, 1944, the net profits of Occo totaled $33,817.09. Up to January 31, 1944, withdrawals were made by Conway, Cooper, and Strickler, of $5,980, $2,990, and $2,990, respectively, totaling $11,960. Their accounts remained credited with balances totaling $21,857.09. On January 31, 1944, the balance sheet of Occo showed total assets of $30,577.24 and total liabilites of $8,720.15, with net worth of $21,857.09. The assets included accounts receivable totaling $23,412.45, which consisted of accounts upon which a factor would be willing to make loans. On some date prior to January 31, 1944, Conway stated to Cooper that he desired his wife and mother-in-law, Caroline W. Thierstein, to become partners in Occo. Cooper said that he had no objection to such a change, but that he would like his wife, Beatrice L. Cooper, hereinafter called Mrs. Cooper, to be recognized as a partner in his stead. Conway spoke to Strickler who stated that he desired his brother, Abraham Strickler, then serving in the armed forces, to be recognized as a partner in his place. Strickler was motivated by a feeling of obligation to his brother for past *135 services in their accounting firm. Cooper was motivated by a desire that his wife acquire an independent estate. Cooper and Strickler were aware that personal income taxes on distributable profits of Occo would be decreased if their interests in the company were effectively transferred. On February 9, 1944, a dissolution of business name certificate dated January 29, 1944, stating that Occo was dissolved on the latter date, was filed by Conway, Strickler, and Cooper in the Clerk's Office of Hudson County, New Jersey. Banks and creditors of Occo were notified to the same effect. On February 1, 1944, Conway, Conway's wife, Conway's mother-in-law, Mrs. Cooper, and Abraham Strickler executed in the presence of Cooper a "Partnership Agreement," which had been drafted by Cooper and which provided, among other matters, that the parties agreed to be general partners in the business of dealing in knitted articles under the name of Occo. The provisions of the instrument were similar to that contained in the instrument executed on June 1, 1943, except that it provided that Conway and his wife and mother-in-law should each receive a one-sixth share of net profits, while Mrs. Cooper and Abraham *136 Strickler were each to receive a one-fourth share of net profits. On February 1, 1944, an entry was made in the general journal of Occo, stating, among other matters, that a general partnership had been organized on that day with the above-named five individuals as partners; that Conway, his wife, and mother-in-law each owed the sum of $1,333.34, while Mrs. Cooper and Abraham Strickler each owed the sum of $2,000, those amounts constituting their respective capital in the business; and that sums were due to Conway, Cooper, and Strickler of $10,928.55, $5,464.27, and $5,464.27, respectively. The latter amounts were credit balances of Conway, Cooper, and Strickler, representing prior profits not withdrawn. On February 8, 1944, the sum of $2,000 was paid into Occo's treasury and credited on the books to the account of Mrs. Cooper. The amount was supplied by Cooper and consisted of $600 which he gave on her behalf, plus $1,400, representing a repayment by him of a prior loan from Mrs. Cooper. On the same day an equal amount was paid into Occo's treasury and credited on the books to the account of Abraham Strickler. This amount was advanced by petitioner Strickler from his own funds, *137 and it was repaid on April 22, 1944, from the trust account in which were deposited profits of Occo distributed to his brother. On February 9, 1944, a business name certificate, dated January 31, 1944, signed by Conway, his wife, and mother-in-law, Mrs. Cooper, and Abraham Strickler, stating that they were conducting a business dealing in knitted articles under the name of Occo Knitting Co., was filed in the Clerk's Office of Hudson County, New Jersey. On February 18, 1944, Conway, Cooper, and Strickler withdrew $6,000, $3,000, and $3,000, respectively, and on March 21, 1944, they withdrew $4,948.55, $2,474.27, and $2,474.27, respectively, from Occo, representing their shares of net profits earned between June 1, 1943, and January 31, 1944. Overpayments totaling $40 were later refunded. Subsequent to February 1, 1944, Occo remained in the same business, and continued to purchase all of its yarn from Holyoke. Conway continued to handle Occo's affairs. Strickler continued as the account for the company, for which payment was made. Strickler watched over his brother's alleged interest in Occo in the same manner in which he had previously guarded his own interests. Cooper had general *138 discussions with Conway concerning Occo's affairs similar to their discussions previous to the above date. Cooper loaned $4,500 to Occo in October 1944. Cooper relied upon Strickler, as the firm's accountant, to protect Mrs. Cooper's alleged interest. Mrs. Cooper and Abraham Strickler did not render any services to Occo. In June 1945, Occo ceased operations. In February 1945, Occo made its last purchases from Holyoke. Occo's sales for the months of March to June, inclusive, in that year were $21,477.38, $394.38, $6.75, and $407.43. Occo's return for the fiscal year ended January 31, 1945, reported ordinary net income of $84,456.81, with distributive shares of $21,114.20 each, to Mrs. Cooper and Abraham Strickler. Occo's return for the fiscal year ended January 31, 1946, reported ordinary net income of $26,168.45, with distributive shares of $6,542.11 each, to Mrs. Cooper and Abraham Strickler. From April 15, 1944, to January 31, 1946, sums aggregating $29,656.31, credited to Abraham Strickler on Occo's books, were withdrawn from the business. Those amounts were received by Strickler who deposited the money in a bank accont in the First National Bank of Paterson, New Jersey, which *139 he opened in his own name, as trustee for Abraham Strickler. During that period Strickler borrowed for one of his firms from the funds thus deposited in the account, the sum of $3,900, which subsequently was repaid. During the same period Strickler drew checks upon that account to the order of Irving Brawer, as loans to accommodate Brawer. No interest was paid and subsequently the loans were repaid. Throughout the years in controversy a checking account was maintained at the National Bank of West New York, New Jersey, in the name of Mrs. Cooper. She had no other bank account. All deposits in that account were made by Cooper. Between February 1, 1944, and January 31, 1946, deposits in the account totaled $74,428.26, and included the following: The sum of $29,656.31 was withdrawn from Occo and deposited in the account by Cooper between April 15, 1944, and January 31, 1946. Amounts aggregating $27,450 were deposited by Cooper, in repayment of loans which had been made by him from the account during the taxable years in the form of 12 checks totaling $26,600 made out to his order, one check of $750 made out to his trust account, and one check of $100 made out to cash and endorsed by *140 him, all the checks having been signed by Mrs. Cooper. A deposit of $4,000 represented repayment of a loan made to Conway Modes. Mrs. Cooper's salary of $1,950 for 1946 from Cooper Knitwear was deposited in the account. Deposits totaling at least $3,100 represented repayment of loans which had been made to Daniel Burkart in the form of four checks totaling $2,300 made out to Burkart and signed by Mrs. Cooper and one check for $800, carrying Mrs. Cooper's name as drawer of the check but not actually signed by her, made out to Cooper's order and endorsed by him to Burkart; the loans being made pursuant to Cooper's wishes in order to give business aid to Burkart who was his friend. Deposits not thus specifically accounted for total $8,271.95. Prior to and subsequent to February 1, 1944, Cooper deposited some funds in the account and gave Mrs. Cooper cash to be used for family and household expenses. During the taxable years additional disbursements made from the account included the following: Mrs. Cooper signed a check in the amount of $4,500 for the benefit of William and Hattie Tate who had come to Cooper for a loan. Amounts were withdrawn to pay Mrs. Cooper's income taxes during *141 that period. The sum of $15,000 was withdrawn from the bank account for investment in the Specialty Realty Company, in which Mrs. Cooper was the only stockholder of record. The money was withdrawn at Cooper's suggestion, and invested under his direction. He is an officer of the company. The company engaged in the purchase and sale of real estate under Cooper's supervision. Mrs. Cooper has at all times been unfamiliar with the operations of the company, its profits, or the location of its funds. The corporation has not dissolved. During the years in dispute Mrs. Cooper drew many checks upon the bank account in order to pay for expenses which a husband supporting his family would normally pay, including personal, family, and household expenses, and food and clothing bills. She drew upon the bank account for such purposes by means of at least 423 checks, bearing various dates during the taxable years, for amounts totaling at least $10,487.25. The tax return of Strickler for the calendar year 1945 reported adjusted gross income of $71,769.70, including $53,461.69 from Holyoke, $14,940.02 from his accounting firm, and showing no income from Occo. Abraham Strickler's return for the same *142 year reported adjusted gross income of $38,787.16, including $21,114.20 from Occo, $14,940.02 from the Strickler accounting firm. The tax return of Strickler for the calendar year 1946 reported adjusted gross income of $80,801.25, including $61,186.98 from Holyoke, $22,176.72 from his accounting firm, and showing no income from Occo. Abraham Strickler's return for the same year reported adjusted gross income of $28,724.43, including $22,167.72 from the Strickler accounting firm and $6,542.11 from Occo. The tax returns of Cooper for the calendar years 1945 and 1946 reported adjusted gross income, consisting of net profit from his profession as attorney, of $19,577.87 and $16,310.75, respectively, showing no income from Occo. Mrs. Cooper's return for 1945 reported adjusted gross income of $21,114.20, coming from Occo, and a total tax of $7,927.38. Her return for 1946 reported adjusted gross income of $8,492.11, consisting of $6,542.11 from Occo, and a salary from Cooper Knitwear Co. of $1,950, and a total tax of $1,717.25. Mrs. Cooper and Abraham Strickler did not in good faith and acting with a business purpose intend to join as partners and did not in fact join together with others *143 as partners in the conduct of the enterprise of Occo Knitting Mills. Opinion Unlike many cases in the field of partnership assignments within the family group, see, e.g., ; ; ; ; cf. , this one does not involve an enterprise where capital was a significant income-producing factor. The business was formed with no capital and promptly earned over $30,000 in the first eight months. It would hence be of little moment if petitioners had assigned their credit balances to the members of their families who became the putative participants in the new partnerships. But in fact they did not even attempt to do so, retaining their shares of the original business. We can reach no other conclusion but that, as in , affirmed (C.A. 7), (May 15, 1951), the income in question was "'produced' by the concerted efforts of the * * * original members *144 of the partnership through their unique knowledge, experience, and contacts in the industry." [Italics supplied.] Only the latter element could have justified a 25 per cent interest in the partnership's considerable profits for petitioner Strickler who was a substantial owner of the partnership's sole source of yarn and for Cooper who was its attorney. The yarn was indispensable to the partnership business, and the service contributed by both petitioners, aside from vaguely described participations in management, was obviously to see that the yarn was available. These contributions they made both before and after creation of the so-called new partnership, and the income was earned by them as surely after it as before. The tax on the income must follow its source. , affirmed (C.A. 2), , certiorari denied, . There is, in addition, considerable doubt that petitioners ever relinquished effective control over the fruits of the enterprise. This consideration, if no other, serves to distinguish , where we said, at p. 1176, in reconciling ; *145 , and , that "the transfer of property to the wife * * * was followed by such dominion, power, and control over the business after the transfer that the husband was held to be the earner of the income." Coupled with the factors already described, it seems to us clear that the tests enumerated by , are not met by the present arrangement; and that the "heavy burden" of proving otherwise is not only undischarged, but that, affirmatively, no reason appears other than petitioners' valuable services, why their respective wife and brother should have participated so generously, or, for the matter of that, at all, in the business earnings. Any other "assumption," to quote petitioners' brief in another connection, "is not consonant with practical business experience." There was, in our view, no actual intention that these concededly non-contributing outsiders should realistically be members of any business operation, and we have so found. Decision will be entered for the respondent.